STATE of Missouri, Respondent,

v.

Derric DUEKER, Appellant.

No. 73426.

Missouri Court of Appeals,
Eastern District,
Division Three.

April 13, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 12, 1999.

Rosalynn Koch, Columbia, Asst. Public Defender, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Linda Lemke, Asst. Attorney General, Jefferson City, for Respondent.

PAUL J. SIMON, Presiding Judge

Derric Dueker (defendant) appeals the judgment entered on the jury's verdict finding him guilty of (1) involuntary manslaughter, pursuant to section 565.024 RSMo 1994 (all further references shall be to RSMo 1994 unless otherwise noted), for which he was sentenced to a term of seven years' imprisonment and a $1000 fine; (2) operation of a motor vehicle without a valid license, pursuant to section 302.020, for which he was sentenced to a concurrent term of fifteen days' imprisonment and a $100 fine; and (3) failure to maintain financial responsibility, pursuant to section 303.025, for which he was sentenced to a concurrent term of fifteen days' imprisonment and a $100 fine.

On appeal, defendant contends that the trial court erred in (1) denying his motion

for judgment of acquittal on the charge of involuntary manslaughter and entering judgment on the jury's verdict because there existed insufficient evidence to convince a rational trier of fact that defendant had caused Darrell Keck's death by acting with criminal negligence in that the evidence did not establish the cause of the collision or did not establish that defendant operated his vehicle in a way that would cause Keck's death; and (2) overruling defendant's objection to the State's argument that the charge of involuntary manslaughter involved a question of whether he had used "the highest degree of care" in operating his vehicle because this argument constituted a misstatement of the law, confused the jury, and invited jurors to apply a lower burden of proof in that the standard pronounced in this argument involved negligence but the State had to show that defendant acted with criminal negligence to convict him of involuntary manslaughter.

Additionally, defendant argues that the trial court (3) "erred and plainly erred" in submitting Instruction No. 5 to the jury because (a) the instruction incorrectly posited that defendant "operated the motor vehicle in a careless and imprudent manner" in that operating a vehicle in such a way does not necessarily constitute criminal negligence; furthermore, the instruction confused the jury regarding the type of negligence which the State had to establish; and (b) there existed no evidence that he had failed to maintain a proper lookout in that the evidence established that he did not hit Keck's bicycle from the rear; furthermore, there existed no evidence that defendant's vehicle swerved into the bicycle to cause the accident; (4) erred in overruling defendant's motion for mistrial after the trial court failed to read the required "recess instruction" to the venirepersons immediately prior to the first recess in that such an instruction would have provided necessary guidance concerning venirepersons' conduct during recesses; the trial court's failure to give the instruction left venirepersons without such guid-

ance and free to discuss the case based upon information obtained during *voir dire;* and (5) erred in denying defendant's motion for judgment of acquittal on the charge of failure to maintain financial responsibility and entering judgment on the jury's verdict because violation of section 303.025 does not constitute a criminal offense in that the applicable statutes do not provide criminal penalties for violation of section 303.025. We affirm.

The record, viewed in a light most favorable to the verdict, reveals that at approximately 3:00 p.m. on August 16, 1995, defendant's shift at Hawk Ridge Golf Course in Lake St. Louis, Missouri, ended, whereupon he drove his vehicle, a Datsun 280ZX, to a Shell station to purchase some gasoline and a twenty-four ounce can of Bud Light. He drank the Bud Light en route to his next destination, a liquor store near the intersection of Lindbergh Boulevard and Interstate 70, where he purchased a six-pack of Busch. He placed the six beers in a cooler and drove to his apartment "off of ... North Lindberg[h]," where he drank at least three of them over a period of about three hours. Having borrowed twenty dollars from a friend named Pat on the previous day, defendant went to the home of Robert Glen in Maryland Heights to attempt to repay Pat. Defendant found no one at Glen's house and returned to his apartment at approximately 6:30 p.m.

Next, having "decided" that he had to go to work on the following day, he went to the home of Gary Lowden in Wentzville with the remaining Busch beers in tow. Defendant stated, "I would have been in trouble if I would have showed up and not brought beer." The drive from his apartment to Lowden's home took approximately thirty minutes. Bob Malphus, Malphus's girlfriend, and her three children were there; Lowden was there but was sick in bed. Defendant stated that he drank "probably maybe" four additional beers at Lowden's house, but expert testi-

mony later would establish that defendant consumed approximately sixteen beers between 3:15 p.m. and 9:15 p.m. that evening. At approximately 8:45 p.m., Malphus's girlfriend asked defendant to follow her and Malphus to a maintenance shop so that defendant could give Malphus a ride back to Lowden's house after Malphus would install training wheels on her children's bicycles. Defendant agreed. Malphus installed the training wheels, his girlfriend and the children left in their own car, and defendant and Malphus went to the clubhouse or pro shop at the golf course to retrieve a candle that would keep mosquitoes away from the rear of Lowden's house.

Shortly after 9:00 p.m., under a clear, dark sky, with a beer between his legs, an expired driver's license on his person, and no proof of insurance in his vehicle, defendant entered Highway N, heading east on his way back to Lowden's house with Malphus. Referring to the section of Highway N on which he would travel that night, defendant stated, "I knew that piece of the road right there, yes." The temperature was eighty-nine degrees; winds blew from the south at eight miles per hour with no precipitation. The record does not indicate that the road was wet.

Defendant claimed that, while traveling at a pace near the speed limit of fifty-five miles per hour on Highway N, he saw Darrell Keck riding a bicycle on the right side of defendant's lane. Defendant stated, "I saw it quite early," approximately 200 yards in front of his vehicle. At approximately the same time, a young man named Brian Scott, driving in another vehicle with three passengers in the opposite lane, saw defendant's car, which appeared to be traveling fast and weaving back and forth between the right edge of the road and the middle of the highway. Scott saw Keck on his bike after seeing defendant's car; specifically, Scott (1) saw reflectors, possibly on the pedals of the bicycle; (2) noticed that Keck was on the right edge of the roadway, always riding in a straight line down that edge; and (3) observed that Keck wore light-colored clothing.

Defendant claimed that, at a point approximately fifty yards behind Keck's bicycle, he removed his foot from the accelerator and prepared to approach and pass Keck. From the opposite direction, Scott's vehicle reached the crest of a small hill having a grade of approximately .003, where a solid yellow line designating a no-passing zone for defendant's lane became a double yellow line designating a no-passing zone for both lanes. Although defendant knew that he was in a no-passing zone, he stated, "I didn't know you couldn't pass a bicycle at that point." He added, "And I thought I could move to the left and go around the bicycle," crossing over the center line. According to defendant, "[s]topping wasn't an option," whether at 200 yards or fifty yards.

When Scott's vehicle reached the crest of the small hill, defendant allegedly believed that he would have to slow down to allow the vehicle to pass before he could move around Keck's bike; although he allegedly removed his foot from the accelerator, he did not apply his brakes. After Scott's car passed, defendant allegedly moved to the left and attempted to evade the bicycle but did not apply his brakes. The bicycle and the vehicle collided, sending Keck into defendant's windshield, over the top of the vehicle, and into the middle of Highway N, some 100 feet from the approximate point of impact. The collision occurred at approximately 9:15 p.m.

Josh McClelland, a passenger in Scott's vehicle, stated that he saw Keck get hit by defendant's car. McClelland observed, "The car came up behind him and it just looked like the guy didn't see the kid on the bike and just hit him." McClelland recalled seeing reflectors on Keck's pedals before the collision occurred. Jimmy Hoelscher, another passenger in Scott's vehicle, did not see the impact but stated that, prior to the impact, Keck "was riding normal"; additionally, Hoelscher did not see the bicycle veer "at all." He said that

he saw defendant's car coming and thought that Keck was going to be hit. The other passenger, Roy Tobias, also did not see the impact but recalled seeing defendant's car "[k]ind of hugging the center line" prior to the collision; he also recalled seeing defendant's bumper nearing one of Keck's tires: "I kept looking back and I seen how close he got to him, he got pretty close about to hit him."

Patrick Haney, a tow truck driver who had been following defendant's vehicle on Highway N for some time, said that he recalled seeing defendant's vehicle "starting to veer off to the left" near the top of the small hill. Haney did not see Keck's bicycle at that time. Upon seeing defendant's vehicle veer, Haney thought that there might be some debris in the road or that someone "was broke down." He moved to the middle of the road to determine what the situation might be. Seeing something resembling a body laying ahead in the middle of the road, he stopped, turned on his truck's emergency lights, and dialed 911. He reported having plenty of time to slow his vehicle and stop after seeing Keck's body. Noticing defendant's vehicle on the side of the road with the passenger door open, Haney believed that someone had fallen out of the car. Defendant approached Haney, identified himself as the driver of the vehicle sitting on the side of the road, and knelt near Keck's head. Haney left the scene after fifteen to twenty minutes had passed, "physically sick" after seeing what looked like Keck's brains on the road.

Matthew Schmiehausen, a Missouri state trooper, received a call regarding the collision at approximately 9:24 p.m. and reached the scene in about five minutes. Upon arriving, he saw paramedics and fire fighters attending to Keck on the roadway. Additionally, he saw defendant and Malphus sitting on the grass on the driver's side of defendant's vehicle. Schmiehausen asked who was driving the vehicle; defendant identified himself. Schmiehausen requested and obtained defendant's expired driver's license, after which he noticed a beer can sitting in a "coolie cup" outside the vehicle, near the rear-left. Defendant admitted that the beer and cup were his and that he had been drinking while driving. He stated that he had consumed about six beers since 3:00 p.m. that day. At a later time, defendant stated that he had consumed eight beers. Schmiehausen noticed the presence of several beer cans behind the driver's and passenger's seat of defendant's vehicle.

At some point while talking to Schmiehausen, defendant stood, enabling Schmiehausen to detect an odor of alcohol emanating from his body. Schmiehausen then placed handcuffs on him, "Mirandized" him, and placed him in the front seat of the vehicle to prevent him from leaving the scene. A few minutes later, Schmiehausen conducted several field sobriety tests with defendant, who failed all of the tests.

Schmiehausen determined that defendant's driver's license had expired more than three years previously on July 11, 1992. Additionally, he determined that defendant lacked insurance coverage on his vehicle. Regarding his driver's license, defendant stated that "he just never got around to getting it renewed." Schmiehausen then transferred defendant to the custody of Corporal Brad Brookshire of the Lake St. Louis Police Department. Jeff Warner, a deputy sheriff of St. Charles County, accompanied Brookshire as Brookshire walked defendant toward Brookshire's car. A helicopter arrived to take Keck to Cardinal Glennon Children's Hospital. Schmiehausen went to the home of Keck's mother, Debra Ernst, to inform her about the collision.

After reaching Brookshire's car, Warner asked Brookshire if defendant was drunk. According to Warner, defendant then interjected, "[F]—k you, I'm not drunk." Warner told defendant to "shut up" and enter the car. Warner reported that defendant then stated, "I don't know why you cops are so p—d off. All I did was hit a f—g kid." Warner again told defendant

to "shut up" and enter the car. Warner said that defendant then invited him to get into the car with him, but Warner declined after Brookshire urged him to ignore defendant.

Brookshire took defendant to the Wentzville Police Department. The trip lasted approximately five to ten minutes. During that time, according to Brookshire, defendant said, "I don't know what the big deal is, all I did was hit a f—g kid." Brookshire ignored defendant, who then added, "I see how this deal is going to be."

At the police station in Wentzville, defendant agreed to take a breathalyzer test administered by Sergeant John Meyer, a certified Type III operator of the breathalyzer. Defendant's blood alcohol content registered .21. Officer Phillip Yocum, a certified Type II operator responsible for the maintenance of the breathalyzer, verified that the machine was operating within parameters set by the Department of Health. Schmiehausen returned to take defendant to the St. Charles County Jail to be "booked" and processed; defendant was released the following day.

On December 15, 1995, Mark Henke, the chief investigator at the St. Charles County prosecuting attorney's office, visited defendant at the Gateway Manor horse farm. Henke advised defendant that he was not under arrest, but read defendant his Miranda rights nonetheless. Defendant waived his rights and agreed to talk to Henke. During questioning, defendant stated that he had consumed between eight and eight and one-half beers on the night of August 16, 1995. He stated that he had seen Keck approximately 200 yards prior to the point of impact and that he had maintained his speed of fifty-five miles per hour even after seeing Keck, removing his foot from the accelerator only when he was about fifty yards behind him.

On February 14, 1996, the State filed an information against defendant, charging him with the Class C felony of involuntary manslaughter, pursuant to section 565.024. On August 6, 1996, the State filed an amended information against him, charging him again with involuntary manslaughter, as well as (a) the misdemeanor of operating a motor vehicle without a valid license, pursuant to section 302.020; (b) the misdemeanor of failing to maintain financial responsibility, pursuant to section 303.025; (c) the infraction of careless and imprudent driving, pursuant to section 304.010; and (d) the infraction of violating the open container law, pursuant to section 577.017.

On April 14, 1997, defendant filed a motion to suppress evidence, a motion to suppress statements taken from him by law enforcement officials, and a motion to suppress evidence of his blood alcohol content. Following a hearing at which the State presented the testimony of Schmiehausen, Meyer, Warner, Brookshire, and Henke, the trial court denied these motions on July 21, 1997. On September 5, 1997, defendant filed a motion for change of venue or, in the alternative, for continuance, citing pre-trial publicity as a basis therefor. The motion was denied.

On the first day of trial, September 8, 1997, the State, with leave, filed a second amended information charging defendant with four counts, including involuntary manslaughter, operation of a motor vehicle without a valid license, failure to maintain financial responsibility, and violation of the open container law.

During *voir dire,* at 10:50 a.m. on the first day of trial, the trial court announced a fifteen minute recess, asking the venirepersons to return to continue *voir dire* at 11:05 a.m. Prior to their departure, the trial court did not read MAI–CR 3d 300.04, known as the "recess instruction." After they left, defendant's attorney moved for a mistrial, noting that the trial court failed to read the instruction. Denying this motion, the trial court noted that they had not yet heard any evidence and stated that it found no reason for instructing them. The trial court indicated that, once a jury had

been empanelled, it would give the cautionary instruction.

Later during *voir dire*, the State told the venirepersons the following, to which defendant's attorney objected:

Part of the charge involves whether or not the highest degree of care was used in operating a motor vehicle, and the principal [sic] of law involved is [that] this requirement imposes on all drivers not only the duty not to drive in a dangerous fashion, but also the positive duty to exercise unusual caution and [sic] extraordinary situations.

For example, a sober person driving at the speed limit who sees a pedestrian crossing the road ahead –

MS. SULLIVAN: Judge, I'm going to object, this is improper.

MR. BRAUN: No, it has been overruled.

THE COURT: Step on up, please.

(Counsel approached the bench and the following proceedings were had:)

THE COURT: Why don't you state your objection for the record?

MS. SULLIVAN: Judge I'm objecting to his legal definitions.... [H]e is attempting to ask the jury to commit to a decision one way or the other. He is attempting to go into the facts of the case.....

Again, he is attempting to lower the burden of proof from criminal negligence to the careless and imprudent or to driving under the influence.

The law – he has not charged it as a DWI. He has charged it as careless and imprudent. That's an improper charge. It is improper argument to make to the jury.

THE COURT: I'm going to overrule the objection. I'm going to warn you, you're on thin ground so you'd best be careful.

* * *

(Back in the presence of the jury panel.)

MR. BRAUN: The concept of law that I was trying to present to you, and I'm going to ask you again now is, there is a duty that every person operating a motor vehicle shall exercise the highest degree of care.

And this requirement imposes on drivers not only the duty not to drive in a dangerous fashion, but a positive duty to exercise unusual caution in extraordinary situations.....

* * *

At trial, the State presented the testimony of Ernst, Tobias, Scott, McClelland, Hoelscher, Haney, Schmiehausen, Warner, Brookshire, Meyer, Yocum, and Henke. The State submitted over twenty-five exhibits, including eighteen photographs, a composite map showing the western portion of St. Charles County, Keck's bike, defendant's coolie cup, Meyer's checklist for the breathalyzer, Yocum's maintenance report on the breathalyzer, a Miranda card, a waiver of rights form signed by defendant, the tickets issued to defendant, and Keck's death certificate.

Additionally, the State presented the expert testimony of Corporal Harold Driehmeier, an accident reconstructionist for the Missouri State Highway Patrol, and Dr. Christopher Long, a forensic toxicologist. Driehmeier prepared a scaled diagram of Highway N showing, *inter alia,* the area of impact between defendant's vehicle and Keck's bicycle, the location of Keck's body, hat, and glasses, and the point at which defendant finally stopped his vehicle after colliding with Keck. The trial court admitted the diagram as evidence. Driehmeier testified that there was no prohibition against bicycles on Highway N and that no minimum speed limit existed there. He also stated that he discovered no skid marks at the scene, leading him to conclude that defendant did not apply his brakes aggressively.

Driehmeier testified that a sober person traveling fifty-five miles per hour on a flat surface could stop in less than 200 feet if he saw a hazard or a person on the highway 200 yards ahead. He did not believe that defendant made a sharp swerve to avoid hitting Keck. Additionally, he stated that, even at fifty yards, a person who already had reacted to the earlier sighting of the hazard or person "would almost be at a complete stop" after applying the brakes fifty yards prior to the hazard. Furthermore, he testified that one traveling behind a slower moving vehicle on a two-lane roadway having a no-passing line on his side has the duty to look out for the slower moving vehicle.

In a prepared report, Driehmeier found three probable alternative contributing circumstances causing the collision: (1) defendant was intoxicated, causing his reaction time to be slower than normal and preventing him from reacting correctly by avoiding the bicycle; or (2) Keck's bike lacked proper equipment such as a headlight and taillight; furthermore, the rear reflector was covered with dirt; or (3) defendant could have been blinded temporarily by Scott's oncoming vehicle. After Driehmeier presented the conclusions of his report, the State elicited the following testimony from him:

Q. Now, if you were told now that the facts were that the driver said that he had seen the bicycle, that he had seen the reflectors at two hundred yards and that he wasn't blinded by oncoming lights, what would your conclusion be as to the cause of this crash?

A. That would take out probably contributing circumstance number two and three and leave us with one of the reaction time and so forth from [defendant's] being intoxicated.

\* \* \*

Q. (By [the State]) Based on what you know about what the defendant has said about this, and all of the measurements and observations that you have made of the evidence, in your opinion, what was the cause of this accident?

A. Since the defendant has made statements since my writing of the report, I would say that my second and third conclusions of probable contributing circumstances of the equipment and the headlights would be taken off and the intoxication would be the probable contributing circumstance to the accident.

\* \* \*

Dr. Long testified that, based on the fact that defendant had been drinking between 3:15 p.m. and 9:15 p.m. on the day of the collision and had a blood alcohol content of .21 within one hour of the collision, he must have consumed approximately sixteen beers during that period of time. He stated that one having a blood alcohol content of .21 or .20 loses his or her peripheral vision, making it difficult to see more than what is directly in front of him or her. Distance, judgment, perception, and the ability to recognize what one sees are impaired because one's sensory input is small; moreover, one cannot assess risk properly. Although one's body may develop tolerance or a "learned response" toward alcohol, such that one may not appear outwardly to be intoxicated, one's mind cannot prevent the aforementioned effects.

Defendant presented his own testimony, the expert testimony of Francis Oldham, an accident reconstructionist, and six photographs. Oldham testified that a person traveling fifty-five miles per hour could stop in approximately 136 feet plus a "reaction distance" of about sixty-one feet. He added that, even at fifty yards, assuming that the alleged release of the accelerator constituted the reaction which normally would consume sixty-one feet of roadway, one still could have stopped before traveling the entire fifty-yard stretch of roadway.

Defendant testified that he did not have insurance coverage for his vehicle for at least one year. He stated, "No, I did not have money for insurance. I spent that on my apartment and ... to buy some beer." He conceded that, on the night of the collision, he may have had a ninth beer. When asked how the beer in the coolie cup reached the ground outside his vehicle, defendant said, "As I jumped out of the car, it kind of came with me and fell on the ground." He denied needing a beer "while they're scraping D.J. Keck up off the highway." When asked whether he would attempt to pass another bicycle spotted 200 yards ahead of him in a no-passing zone on Highway N after drinking eight beers, defendant answered, "If I thought I could pass, yes."

The State and defendant stipulated that Keck died on August 19, 1995 as a direct result of massive head injuries sustained on August 16, 1995, when the collision occurred between defendant's vehicle and Keck's bike. At the close of all the evidence, defendant filed a motion for judgment of acquittal which was denied.

At the instruction conference, defendant's attorney lodged her objection to Instruction No. 5 as follows:

As to Instruction Number Five, I believe that that instruction, in fact, lowers the burden of the State by the language of careless and imprudent manner in paragraph six. That in doing so, defendant operated the motor vehicle in a careless and imprudent manner. And in paragraph seven, he was thereby negligent. I believe careless and imprudent manner is not a – is not the same standard as criminally negligent and lowers their burden of proof from criminally negligent to the lesser standard of careless and imprudent.

Instruction No. 5 provided as follows:

### INSTRUCTION NO. 5

As to Count 1, if you find and believe from the evidence beyond a reasonable doubt:

First, that on August 16, 1995, on Missouri Route "N", in the County of St. Charles, State of Missouri, the defendant operated a motor vehicle, and

Second, that he did so while in an intoxicated condition, and

Third, that defendant caused the death of Darrell Wayne Keck, Jr. by striking him with a motor vehicle, and

Fourth, that defendant failed to maintain a proper lookout, and

Fifth, that defendant thereby endangered the life or limb of Darrell Wayne Keck, Jr., and

Sixth, that in doing so defendant operated the motor vehicle in a careless and imprudent manner, and

Seventh, that defendant was thereby criminally negligent, then you will find the defendant guilty under Count 1 of involuntary manslaughter.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of involuntary manslaughter.

As used in this instruction, the term "intoxicated condition" means under the influence of alcohol.

As used in this instruction, the term "criminally negligent" means failure to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

\* \* \*

The trial court responded to her objection by asking whether she had an instruction to tender; she answered, "No, I do not." The trial court denied her objection.

The jury returned a verdict of guilty on the counts of involuntary manslaughter, operation of a motor vehicle without a valid license, and failure to maintain financial responsibility. The jury acquitted de-

fendant on the charge of violation of the open container law. Pursuant to Rule 29.11(b), defendant then filed a motion for leave to file his motion for new trial ten days beyond the regular deadline; the trial court granted this motion.

On September 30, 1997, defendant filed a motion for judgment of acquittal or, in the alternative, for new trial. Defendant argued, *inter alia*, that the trial court erred in (1) failing to read MAI–CR 3d 300.04 to the venirepersons at every recess, thereby prejudicing defendant and denying him his rights to equal protection and due process under various provisions of the federal and State constitutions; (2) denying his motion for judgment of acquittal at the close of all the evidence in that the State did not present a submissible case for the jury's consideration and failed to prove its case beyond a reasonable doubt; furthermore, the jury's verdict was against the weight of the evidence; and (3) submitting Instruction No. 5 to the jury because the phrasing of the instruction reduced the State's burden in that careless and imprudent driving and the failure to keep a proper lookout do not involve the same standard of care contemplated in the term *criminal negligence*. The trial court denied defendant's motion.

In his first point on appeal, defendant contends that the trial court erred in denying his motion for judgment of acquittal on the charge of involuntary manslaughter and entering judgment on the jury's verdict because there existed insufficient evidence to convince a rational trier of fact that defendant had caused Darrell Keck's death by acting with criminal negligence in that the evidence did not establish the cause of the collision or did not establish that defendant operated his vehicle in a way that would cause Keck's death.

On review, we accept as true all of the evidence favorable to the verdict, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *State v. Grim*, 854 S.W.2d 403, 405 (Mo.banc 1993). In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.* A jury is permitted to draw such reasonable inferences from the evidence as the evidence will permit, and may believe or disbelieve all, part, or none of the testimony of any witness. *State v. White*, 847 S.W.2d 929, 933 (Mo.App. E.D.1993).

Defendant concedes that a showing that he failed to maintain a proper lookout can support his conviction of involuntary manslaughter. *See, e.g., State v. Dagley*, 793 S.W.2d 420, 424–25 (Mo.App. W.D.1990). Here, however, defendant maintains that the State could not establish the cause of the collision leading to Keck's death and did not show that it was anything other than an unavoidable accident. In contrast, the State argues that the evidence and reasonable inferences therefrom showed that defendant never saw Keck riding on the side of Highway N and failed to keep a proper lookout.

■ We initially consider whether the evidence and reasonable inferences therefrom showed that defendant never saw Keck. Although defendant claimed that he saw Keck at 200 yards, that he released the accelerator at fifty yards, and that, immediately prior to impact, he moved to the left and attempted to evade the bicycle, the jury was entitled to disbelieve his testimony. The jury instead may have credited (1) Dr. Long's testimony that (a) defendant must have consumed approximately sixteen beers during the six hours prior to the collision, causing him to have a blood alcohol content of .21 within one hour of the collision; and (b) one having a blood alcohol content of .21 or .20 loses one's peripheral vision, making it difficult to see more than what is directly in front of oneself, impairing distance, judgment, perception, and the ability to recognize what one sees, and preventing one from assessing risk properly; (2) Scott's testi-

mony that defendant's vehicle appeared to be traveling fast and weaving in its lane; (3) McClelland's testimony that he saw the impact and that defendant approached Keck from behind, apparently failed to see him, and "just hit him"; (4) Hoelscher's testimony that he did not see the bicycle veer "at all" and that the sight of defendant's oncoming vehicle led him to think that Keck was going to be hit; and (5) Tobias's testimony that defendant's bumper neared one of Keck's tires, leading Tobias to "ke[ep] looking back" and notice "how close he got to him." Additionally, noting that Haney testified that he did not see Keck's bicycle while traveling behind defendant, the jury may have inferred that, at the time when Haney saw defendant's vehicle veer to the left, defendant already had struck Keck and was in the process of leaving the highway in order to stop. Thus, the evidence at trial and reasonable inferences therefrom indeed showed that defendant never saw Keck riding on the side of Highway N.

If defendant never saw Keck, he may have failed to keep a proper lookout. In determining whether defendant failed to do so, the jury may have credited (1) Driehmeier's testimony that one traveling behind a slower moving vehicle on a two-lane roadway having a no-passing line on his or her side has the duty to look out for the slower moving vehicle; (2) Scott's testimony that Keck wore light-colored clothing and stayed on the right edge of the roadway while traveling in a straight line; and (3) McClelland's testimony that he saw reflectors on Keck's pedals. Such evidence showed that defendant should have seen Keck but failed to keep a proper lookout, leading him to strike Keck.

Defendant's argument that the State could not establish the cause of the collision leading to Keck's death is without merit. Although Driehmeier testified that one of three probable alternative contributing circumstances caused the collision, two of those circumstances were shown not to exist. Therefore, the jury was free to believe that the only remaining circumstance, that defendant was intoxicated, causing his reaction time to be slower than normal and preventing him from reacting correctly by avoiding the bicycle, constituted the cause of the collision. Thus, the State established the cause of the collision leading to Keck's death. Moreover, Driehmeier's testimony concerning the only remaining circumstance constituted substantial evidence that defendant operated his vehicle in a way that would cause Keck's death. Point denied.

■ In his second point on appeal, defendant argues that the trial court erred in overruling his objection to the State's argument that the charge of involuntary manslaughter involved a question of whether he had used "the highest degree of care" in operating his vehicle because this argument constituted a misstatement of the law, confused the jury, and invited jurors to apply a lower burden of proof because the standard involved negligence but the State had to show that defendant acted with criminal negligence to convict him of involuntary manslaughter.

Although defendant objected to the State's argument during *voir dire*, he did not renew this issue in his motion for new trial. Paragraph 5 of his motion for new trial mentions another matter not pertinent to the one addressed in this second point on appeal. Therefore, we may not review the trial court's ruling for error. Although we may review for plain error under Rule 30.20 if manifest injustice or miscarriage of justice has resulted from a ruling affecting substantial rights, we decline to do so here because we do not find the State's argument to be a misstatement of the law in these circumstances. *See Dagley*, 793 S.W.2d at 424 (essentially tracking the language used by the State). Point denied.

In his third point on appeal, defendant contends that the trial court "erred and plainly erred" in submitting Instruction No. 5 to the jury because (a) the instruction incorrectly posited that defendant "op-

erated the motor vehicle in a careless and imprudent manner" in that operating a vehicle in such a way does not necessarily constitute criminal negligence; furthermore, the instruction confused the jury regarding the type of negligence which the State had to establish; and (b) there existed no evidence that he had failed to maintain a proper lookout in that the evidence established that he did not hit Keck's bicycle from the rear; furthermore, there existed no evidence that defendant's vehicle swerved into the bicycle to cause the accident.

The record reveals that, at the instruction conference, defendant raised an objection similar to the claim of error stated in subpoint (a) and that he renewed his claim of error in his motion for new trial. Defendant concedes that, at the same instruction conference, he failed to object to Instruction No. 5 on the ground stated in subpoint (b). Therefore, he requests that, with respect to subpoint (b), we review for plain error.

■■■ We first consider subpoint (a). Rule 28.02(c) requires that any applicable MAI–CR instruction be given to the exclusion of any other instruction. Under Rule 28.02(f), the giving or failure to give an instruction in violation of Rule 28.02 or any applicable Notes on Use shall constitute error whose prejudicial effect must be judicially determined, provided that a timely objection has been made pursuant to Rule 28.03. A faulty instruction provides grounds for reversal if defendant suffers prejudice. *State v. Strughold*, 973 S.W.2d 876, 884 (Mo.App. E.D.1998). A defendant is prejudiced by an erroneous instruction when the jury may have been adversely influenced by it. *State v. Caldwell*, 956 S.W.2d 265, 267 (Mo.banc 1997).

Initially, we must determine whether the giving of Instruction No. 5 constituted error for the reasons specified in subpoint (a). Although the applicable instruction, MAI–CR 3d 313.12, includes only five paragraphs compared to the seven contained in Instruction No. 5 herein, Paragraph Fourth of MAI–CR 3d 313.12 specifically directs the user to "*[i]nsert [the] specific act or acts of negligence such as violating an electrical signal, driving on the wrong side of the road, etc.*" (emphasis in original). The State contends that, in inserting Paragraph Sixth in Instruction No. 5, it merely complied with this direction.

■■■ ·Defendant correctly notes that MAI–CR 3d 313.12 does not contain Paragraph Sixth. He argues that a showing that one operated a motor vehicle in a careless and imprudent manner is not proof of criminal negligence. He is correct insofar as such a showing, in and of itself, does not constitute proof of criminal negligence. Similarly, a showing that one "violat[ed] an electrical signal" does not necessarily constitute proof of criminal negligence. What defendant fails to recognize is that one cannot be guilty of criminal negligence before being guilty of negligence. The pattern instruction, when read in its entirety, certainly recognizes this precept. Therefore, the inclusion of various instances of negligence in an instruction patterned after MAI–CR 3d 313.12 does not constitute a deviation from that instruction; rather, it explicitly complies with it. Moreover, the specification of the items required by Paragraph Fourth of MAI–CR 3d 313.12 in separate paragraphs within Instruction No. 5 does not constitute a deviation from the pattern · instruction.

Defendant also contends that the "tenor" of Instruction No. 5 improperly suggested to the jury that the operation of a vehicle in a careless and imprudent manner, in and of itself, constitutes criminal negligence. In support of this argument, defendant refers to the use of the word *thereby* in Paragraph Seventh, which immediately follows the paragraph regarding the manner in which defendant operated his vehicle. Careful analysis of defendant's argument reveals that it could apply just as easily to MAI–CR 3d 313.12 itself,

for the pattern instruction directs the user to (1) insert in Paragraph Fourth an act of negligence such as "violating an electrical signal"; and (2) follow that paragraph with Paragraph Fifth, which, like Instruction No. 5, uses the term *thereby*.

We reject defendant's argument because both MAI–CR 3d 313.12 and Instruction No. 5 contain a definition of the term *criminal negligence*. This definition describes a standard clearly higher than the tort standard of negligence. Moreover, in context, the term *thereby* in Paragraph Fifth of MAI–CR 3d 313.12 and in Paragraph Seventh of Instruction No. 5 refers to all preceding paragraphs, not only the immediately preceding one. Subpoint denied.

In subpoint (b), defendant maintains that there existed no evidence that he had failed to maintain a proper lookout in that the evidence established that he did not hit Keck's bicycle from the rear; furthermore, there existed no evidence that defendant's vehicle swerved into the bicycle to cause the accident.

■ For instructional errors to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury as to cause manifest injustice. *White*, 847 S.W.2d at 933. The reviewing court must examine the facts and circumstances to determine whether plain error exists. *Id.*

■ In our disposition of point one, we determined that substantial evidence existed to show that defendant failed to keep a proper lookout, leading him to strike Keck. To establish that defendant failed to maintain a proper lookout, the State need not have shown that he hit the bicycle from the rear. Furthermore, the viability of Instruction No. 5 did not depend upon the State's ability to present evidence that defendant's vehicle swerved into the bicycle to cause the accident. Under the facts and circumstances, in giving Instruction No. 5, the trial court did not so misdirect or fail

to instruct the jury as to cause manifest injustice. Subpoint denied.

■ In his fourth point on appeal, defendant argues that the trial court erred in overruling his motion for mistrial after the trial court failed to read the required "recess instruction" to the venirepersons immediately prior to the first recess in that such an instruction would have provided necessary guidance concerning venirepersons' conduct during recesses; the trial court's failure to give the instruction left venirepersons without such guidance and free to discuss the case based upon information obtained during *voir dire*.

On this point, *State v. Barajas*, 930 S.W.2d 74 (Mo.App. W.D.1996), is instructive. There, during *voir dire* and immediately prior to the first recess, the trial court failed to read MAI–CR 3d 300.04. The defendant did not object until the venirepersons returned, at which time he moved to strike the panel. His motion was denied, and he continued his *voir dire* examination. The defendant had the opportunity, if he was concerned about outside influence, to question the panel members about the matters addressed in MAI–CR 3d 300.04. He chose not to do so. On appeal, our colleagues of the Western District held that a timely objection should have been registered with the trial court before the panel recessed. A timely objection would have allowed the trial court to take corrective action. To the extent that the defendant failed to question venirepersons about this particular subject, having been given the opportunity to do so, he waived any claim of error. By failing to remind the court to give the instruction when it was apparent that the panel was going to be excused without the reading of the instruction, the defendant waived his right to appellate review. In light of the defendant's failure to timely object and his failure to question venirepersons about publicity or outside influence to which they may have been exposed during the first recess, the defendant waived any claim of

error and failed to show prejudice. *Id.* at 74–75.

Here, the facts are nearly identical to those detailed in *Barajas.* Although defendant here lodged his objection after the venire recessed but before they returned, and although he requested a mistrial rather than a striking of the panel, he too failed to question the venirepersons about any publicity or outside influence to which they may have been exposed during the first recess. Therefore, he waived any claim of error and failed to show prejudice. *Id.* at 75. Point denied.

 In his final point on appeal, defendant maintains that the trial court erred in denying his motion for judgment of acquittal on the charge of failure to maintain financial responsibility and entering judgment on the jury's verdict because violation of section 303.025 does not constitute a criminal offense in that the applicable statutes do not provide criminal penalties for violation of section 303.025.

The record reveals that defendant failed to raise this issue before, during, or after trial. No reference to this issue appears in his motion for new trial. Although we may review for plain error under Rule 30.20 if manifest injustice or miscarriage of justice has resulted from a ruling affecting substantial rights, we decline to do so here because we do not find defendant's argument to have merit. *See* sections 303.025 and 303.370.5; *cf. State v. Mayo,* 915 S.W.2d 758, 762–63 (Mo.banc 1996) (holding that the suspension or revocation of a driver's license is not a sanction which, once imposed, precludes the application of criminal sanctions). Point denied.

Judgment affirmed.

KATHIANNE KNAUP CRANE, J., and LAWRENCE E. MOONEY, J., concur.